FILED
 2010 Sep-07 AM 09:38
 U.S. DISTRICT COURT
 N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| **ABBOTT POINT OF CARE, INC.,** | } |
| Plaintiff, | } |
| v. | } CASE NO. 5:09–cv-1678-SLB |
| **EPOCAL, INC.,** | } |
| Defendant. | } |

## MEMORANDUM OPINION

This case is currently before the court on the following motions: defendant Epocal, Inc.'s ("Epocal") Motion to Dismiss, (Doc. 7), plaintiff Abbott Point of Care, Inc.'s ("Abbott") Motion to Compel Discovery and Determine Status of the 2000 Letter, (Doc. 23), Abbott's Motion for *In Camera* Review of 2000 Letter, (Doc. 25), and Epocal's Motion to Stay or Strike Abbott's Privilege Motions, (Doc. 28).[1]  Abbott has sued Epocal for patent infringement, alleging the willful and deliberate infringement of two patents. (Doc. 1 at ¶¶ 23-24, 33-34.)  Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that Abbott's Motion for *In Camera* Review of 2000 Letter, (Doc. 25), is due to be granted, and Epocal's Motion to Dismiss, (Doc. 7), is due to be granted.  As a result of the granting of Epocal's Motion to Dismiss, Abbott's Motion to Compel Discovery and Determine Status of the 2000 Letter,

---

[1] Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

(Doc. 23), and Epocal's Motion to Stay or Strike Abbott's Privilege Motions, (Doc. 28), are both due to be denied as moot.

## I. **MOTION TO DISMISS STANDARD OF REVIEW**

Under Rule 12(b)(1) of the Federal Rules, a party may move the court to dismiss a case if the court lacks jurisdiction over its subject matter. Fed. R. Civ. Proc. 12(b)(1). The plaintiff, as the party invoking jurisdiction, bears the burden of establishing the court's subject matter jurisdiction. *See Taylor v. Appleton*, 30 F.3d 1365, 1367 (11th Cir.1994).

Attacks on subject matter jurisdiction consist of two types: "facial attacks" and "factual attacks." *See McElmurray v. Consol. Gov't of Augusta-Richmond County*, 501 F.3d 1244, 1251 (11th Cir. 2007). "'Facial attacks' on the complaint 'require[ ] the court merely to look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion.'" *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990) (quoting *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)). Motions alleging facial attacks on subject matter jurisdiction therefore afford plaintiffs the same procedural safeguards as those in a 12(b)(6) motion, in that the court must consider the allegations in the complaint to be true. "'Factual attacks,' on the other hand, challenge 'the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered.'" *Id.* at 1529 (quoting *Menchaca*, 613 F.2d at 511); *see also*

*Morrison v. Amway Corp.*, 323 F.3d 920, 924 n.5 (11th Cir. 2003) (deciding that a factual attack had occurred because the motion to dismiss relied on extrinsic evidence and did not assert a lack of subject matter jurisdiction based solely on the pleadings).

## II. FACTUAL AND PROCEDURAL HISTORY

Abbott is a New Jersey corporation engaged in the development and manufacture of certain healthcare products, including patient-side blood-testing systems. (Doc. 1 at ¶¶ 1, 7.) Epocal is a Canadian corporation founded in March of 2001 by inventor Dr. Imants Lauks ("Lauks"). (*Id.* at ¶¶ 2, 19.) Epocal is likewise engaged in the development and manufacture of patient-side blood-testing systems. (*Id.* at ¶ 20.)

Prior to founding Epocal, Lauks was an employee of Abbott's predecessors, Integrated Ionics Incorporated ("Integrated Ionics") and i-STAT Corporation ("i-STAT"). (*Id.* at ¶ 11.) While employed at Integrated Ionics, Lauks entered into an employee agreement, dated January 10, 1984 (the "1984 Agreement"). (*Id.*) The 1984 Agreement includes several covenants related to confidentiality, non-competition, and non-solicitation. (*Id.*) The 1984 Agreement also contains a disclosure and assignment covenant (the "Disclosure and Assignment Covenant"), which states in part that:

> I [Lauks] agree to promptly communicate to Integrated Ionics, and to assign to Integrated Ionics or its designee all of my rights in, any inventions, improvements or discoveries, whether patentable or not, which I currently own or possess or which I may make or conceive during my employment by Integrated Ionics or which relate to any present or prospective activities of Integrated Ionics; and I do hereby assign to Integrated Ionics and authorize

3

>and request competent patent authorities, domestic and foreign, to honor and recognize this document as a full and complete assignment thereof.

(*Id.*, Ex. A at APOC0001006.)

Integrated Ionics later became i-STAT, and in 1992 Lauks entered into an employee agreement with i-STAT, dated January 29, 1992 (the "1992 Agreement"). (*Id.* at ¶ 12; Doc. 9-2 at 5; Doc. 9 at Ex. 1.) The 1992 Agreement includes provisions that, *inter alia*, defined Lauks's duties as i-STAT's Vice President of Research and Development, Chief Technology Officer, and member of the Board of Directors, set out his compensation and other benefits, and defined how and when i-STAT could terminate Lauks's employment with or without cause. (*See* Doc. 9 at Ex. 1.) The 1992 Agreement specifies that Lauks's compensation was "[f]or all services to be rendered by Dr. Lauks and all covenants undertaken by him pursuant to this Agreement and the Confidentiality and Non-Competition Agreement referred to in [the section of the Agreement defining termination for cause]." (*Id.*, Ex. 1 at 2.) The 1992 Agreement defines "cause" to mean, *inter alia*, "breach or non-observance by Dr. Lauks of any of the covenants contained herein or in that certain letter agreement entered into on January 10, 1984, between the Company and Dr. Lauks concerning employee confidentiality and non-competition (the 'Confidentiality and Non-Competition Agreement')." (*Id.*, Ex.1 at 4.) Lastly, the 1992 Agreement states that "[t]his Agreement contains the entire agreement of the parties with respect to its subject matter and supersedes all prior arrangements or understandings, whether oral or written, with respect thereto." (*Id.*, Ex. 1 at 5.)

Lauks resigned from his positions at i-STAT on or about September 1, 1999. (Doc. 1 at ¶ 13.) However, concurrently with his resignation, Lauks entered into an eighteen-month exclusive consulting agreement with i-STAT (the "1999 Consulting Agreement"). (*Id.*) In its opening paragraph, the 1999 Consulting Agreement states in part that "[t]he Consulting Agreement does not extend to work on new products, whether or not based on [i-STAT's] core technology and whether or not for point-of-care blood analysis applications." (*Id.*, Ex. B at 1.) The 1999 Consulting Agreement also includes a clause entitled "Continuation of Employee Confidentiality, Non-Solicitation and Non-Competition Covenants" (the "Continuation Clause"). (*Id.*, Ex. B at 4.) The Continuation Clause states that "[t]he existing agreement between Lauks and the Company regarding confidentiality, non-solicitation and non-competition (the 'Existing Confidentiality Agreement') shall remain in place as if Lauks remained employed by the Company, except that the covenants regarding non-competition shall run for 18 months after the execution of the Consulting Agreement."[2] (*Id.*)

By its terms, the 1999 Agreement ended on March 1, 2001. (*See id.*, Ex. B at 2.) Following its termination, in March of 2001, Lauks founded Epocal. (Doc. 1 at ¶¶ 2, 19.) Thereafter, in June of 2001, Lauks filed two patent applications, which later issued as United States Patents Nos. 6,896,778 (the "778 Patent") and 6,845,327 (the "327 Patent") (collectively the "Disputed Patents"). (*Id.* at ¶ 14.) Lauks, as the sole inventor of the

---

[2] The 1984 Agreement had specified that the covenants regarding non-competition continued for six months after the date of Lauks's termination with Integrated Ionics, absent unanimous approval from the company's Board of Directors. (*See* Doc. 1, Ex. A at APOC0001006.)

Disputed Patents, assigned the patents to Epocal in December of 2003. (Doc. 9-2 at 9.) Then, in 2004, Abbott acquired i-STAT. (*See* Doc. 1 at ¶ 12.)

In a related case, ("Case I"), on March 28, 2008, Abbott sued Epocal for the infringement of four patents owned by Abbott; Case I was assigned to Judge C. Lynwood Smith, Jr. *See* Complaint at ¶¶ 8-13, *Abbott Point of Care, Inc. v. Epocal, Inc.*, No. 5:08-cv-00543-CLS (N.D. Ala. filed Mar. 28, 2008). During discovery in Case I,[3] Epocal inadvertently disclosed to Abbott a letter from Kevin L. LaRoche, an attorney with the Canadian law firm Borden Ladner Gervais LLP (the "BLG Law Firm"), to Lauks, dated March 31, 2000 (the "2000 Letter"). (Doc. 24 at 3.) The 2000 Letter relates to the 1984 Agreement. (*Id.* at 1.) Claiming attorney-client privilege and that the 2000 Letter was protected as work product, Epocal "clawed back" the 2000 Letter from Abbott pursuant to a Stipulated Protective Order entered by Judge Smith in Case I; the parties scheduled a meet and confer. (*See id.* at 3.) During the meet and confer, Epocal informed Abbott that it had discovered that the 2000 Letter had been voluntarily disclosed via email to two third parties on February 28, 2007. (*Id.*; Doc. 33 at 3-4.) Specifically, in late 2006 or early 2007, Epocal had entered into negotiations with Highland Capital Management LP ("Highland") to receive Series C private-equity financing; Epocal, through the BLG Law Firm, had included the 2000 Letter in the due-diligence documents that it sent to Highland. (Doc. 33 at 3.) Epocal had also disclosed the 2000 Letter to Aquilo Partners Inc. ("Aquillo"), which had served as the

---

[3] The parties agreed to use discovery from Case I in this case. (Doc. 24 at 3 n.2.)

exclusive placement agent for the transaction between Epocal and Highland. (*Id.*) Both Highland and Aquillo had signed confidentiality agreements prior to Epocal sending the due-diligence documents. (*Id.*) Epocal informed Abbott that its position was that the 2000 Letter remained protected under the common interest doctrine and also remained protected as work product. (Doc. 24 at 2.)

Thereafter, Abbott moved to amend the complaint in Case I to add additional claims against Epocal for infringement of the Disputed Patents. *See* SEALED Motion for Leave, *Abbott Point of Care, Inc. v. Epocal, Inc.*, No. 5:08-cv-00543-CLS (N.D. Ala. filed June 16, 2009). However, because Abbott sought leave to amend the complaint almost a year after Case I's deadline for amending the pleadings, Judge Smith denied the motion, noting that Abbott had not shown "good cause" under Fed. R. Civ. P. 16(b)(4). *See* Order at 1, *Abbott Point of Care, Inc. v. Epocal, Inc.*, No. 5:08-cv-00543-CLS (N.D. Ala. filed July 15, 2008).

After Judge Smith denied Abbott's motion to amend the complaint in Case I, Abbott, on August 21, 2009, filed the instant Complaint against Epocal. (Doc. 1.) The Complaint asserts two counts against Epocal for infringement of the Disputed Patents. (*Id.* at ¶¶ 22-41.) Specifically, the Complaint alleges that the 1984 Agreement, along with its Disclosure and Assignment Covenant, remained in effect until March 1, 2001 pursuant to the Continuation Clause of the 1999 Consulting Agreement. (*Id.* at ¶ 13.) The Complaint further alleges that Lauks "conceived of" the inventions claimed in the Disputed Patents prior to March 1, 2001; thus, the Complaint alleges that Abbott, as the successor of i-STAT and Integrated Ionics,

7

owns the Disputed Patents. (*Id.* at ¶ 17-18.) Thereafter, the Complaint alleges that "Epocal has made, used, offered to sell, and/or sold, and continues to make, use, offer to sell, and/or sell products and/or services . . . including, without limitation, patient-side blood testing systems that infringe the [Disputed Patents]," and that the infringement "has been and continues to be willful and deliberate." (*Id.* at ¶¶ 21, 24, 34.)

In response to the Complaint, Epocal filed its Motion to Dismiss Abbott's Complaint Under Rule 12(b)(1) For Lack of Subject Matter Jurisdiction and/or Under Rule 12(b)(6) For Failure to State a Claim Upon Which Relief Can Be Granted. (Doc. 7.)

Abbott later filed its Motion to Compel Discovery and Determine Status of the 2000 Letter,[4] (Doc. 23), and a separate Motion for *In Camera* Review of 2000 Letter, (Doc. 25). In response, Epocal, contending that the dispute regarding the 2000 Letter was an issue for Judge Smith to decide in Case I, filed its Motion to Stay or Strike Abbott's Privilege Motions and Memorandum in Support. (Doc. 28.) On the same day, in Case I, Epocal moved for a protective order with respect to the 2000 Letter. (*Id.* at 3 n.2.) However, on January 15, 2010, Judge Smith denied Epocal's request, stating that because "Epocal's motion does not address the use of any documents *in the action assigned to this judge*, it is DENIED." *See* Order at 1-2, *Abbott Point of Care, Inc. v. Epocal, Inc.*, No. 5:08-cv-00543-CLS (N.D. Ala. filed Jan. 15, 2010).

---

[4] Abbott had filed a similar Motion to Compel Discovery and Determine Status of Disputed Document on November 3, 2009, which expressly referenced and attached the 2000 Letter. (Doc. 16.) However, Abbott subsequently withdrew the motion after Epocal expressed procedural concerns. (*See* Doc. 19; Doc. 24 at 1.)

During oral argument on all pending motions, (Docs. 7, 23, 25 & 28), the court decided to grant Abbott's Motion for *In Camera* Review of 2000 Letter, (Doc. 25), and reviewed the 2000 Letter at that time.

### III. **DISCUSSION**

In its Memorandum in Support of its Motion to Dismiss, Epocal contends that the court should dismiss Abbott's Complaint "[f]or at least four reasons." (Doc. 9-2 at 2.) For its first reason, pursuant to Fed. R. Civ. P. 12(b)(1), Epocal argues that the 1999 Consulting Agreement did not continue the 1984 Agreement's Disclosure and Assignment Covenant, that Abbott therefore does not own the Disputed Patents, and for that reason lacks standing to sue. (*Id.*) Epocal asserts both facial and factual attacks under its first reason. (*See id.* at 14, 17.) With respect to its second reason, Epocal insists that the 1992 Agreement supercedes the 1984 Agreement, that the 1992 Agreement did not continue the 1984 Agreement's Disclosure and Assignment Covenant, and that, accordingly, Abbott lacks standing to sue. (*Id.* at 2.) Regarding its third reason, Epocal maintains that "Abbott's claim to own the [Disputed Patents] under the 1984 or 1999 Agreements is . . . barred by the statute of limitations," and as a result Abbott's Complaint is due to be dismissed under Fed. R. Civ. P. 12(b)(6). (*Id.* at 3.) Lastly, as to Epocal's fourth reason, it claims that "even if Abbott were correct concerning 'the terms of the 1984 Agreement,' the complaint should still be dismissed because it does not *plausibly* suggest that Abbott owns the [Disputed Patents],"

9

and thus fails to satisfy the pleading requirements of Rule 12(b)(6), as clarified by the recent decisions of the United States Supreme Court in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-57 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1951-53 (2009). (*Id.* at 3-4.) Because the court finds merit in Epocal's facial attack under its first reason, only it need be addressed.

"The question of standing to sue [for patent infringement] is a jurisdictional one." *See Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1551 (Fed. Cir. 1995) (en banc) (citing *Imperial Tobacco, Ltd. v. Phillip Morris, Inc.*, 899 F.2d 1575, 1580 n.7 (Fed. Cir. 1990)). The question is resolved by statute under the Patent Act, *see Propat. Intern. Corp. v. Rpost, Inc.*, 473 F.3d 1187, 1189 (Fed. Cir. 2007), which provides that "[a] patentee shall have remedy by civil action for infringement of his patent," 35 U.S.C. § 281 (2006). The term "'patentee' includes not only the patentee to whom the patent was issued but also successors in title to the patentee." *Id.* § 100(d). Thus, when the patentee to whom the patent was issued conveys his or her title in the patent to another, the assignee obtains "both title in the patent and the right to sue infringers." *State Contracting & Eng'g Corp. v. Condotte Am., Inc.*, 346 F.3d 1057, 1062 (Fed. Cir. 2003) (citing *Rite-Hite*, 56 F.3d at 1551). But, the assignee "must produce a written instrument documenting the transfer of proprietary rights in the patents" to obtain title and the right to sue. *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1250 (Fed. Cir. 2000) (citing 35 U.S.C. § 261).

In its Complaint, Abbott asserts that it obtained all rights in the Disputed Patents, and the right to sue infringers, pursuant to the Disclosure and Assignment Covenant of the 1984

10

Agreement, which Abbott maintains was carried over to the 1999 Consulting Agreement through its Continuation Clause. (*See* Doc. 1 at ¶¶ 13, 17-18.) By contrast, as aforementioned, Epocal contends that the 1999 Consulting Agreement did not continue the 1984 Agreement's Disclosure and Assignment Covenant, and therefore the court should dismiss Abbott's Complaint pursuant to the "facial attack" standard of Rule 12(b)(1). (Doc. 9-2 at 14-17.) Thus, the issue is one of contract interpretation. In interpreting the 1999 Consulting Agreement, because the agreement specifies that it "shall be governed by the laws of the State of New Jersey," (Doc. 1, Ex. B at 5), the court applies New Jersey law.

In interpreting a contract, it is "well-settled . . . that when the terms of a contract are clear, 'it is the function of a court to enforce it as written and not to make a better contract for either of the parties.'" *CSFB 2001-CP-4 Princeton Park Corporate Ctr., LLC, v. SB Rental I, LLC*, 980 A.2d 1, 4 (N.J. Super. Ct. App. Div. 2009) (quoting *Kampf v. Franklin Life Ins.*, Co., 161 A.2d 717 (N.J. 1960); *see also Borough of Princeton v. Bd. of Chosen Freeholders of County of Mercer*, 755 A.2d 637, 645 (N.J. Super. Ct. App. Div. 2000) ("The polestar of contract construction is to discover the intention of the parties as revealed by the language used by them." (citing *Jacobs v. Great Pac. Century Corp.*, 518 A.2d 223, 227 (N.J. 1986))). Therefore, "[a]bsent ambiguity, the intention of the parties is to be ascertained by the language of the contract." *CSFB 2001-CP-4*, 980 A.2d at 4 (citing *Dontzin v. Myer*, 694 A.2d 264 (N.J. Super. Ct. App. Div. 1997)). What's more, the contract "must be read as a whole, without artificial emphasis on one section, with a consequent disregard for others.

11

Literalism must give way to context." *Borough of Princeton*, 518 A.2d at 645 (citing *Schenck v. HJI Assocs.*, 685 A.2d 481 (N.J. Super. Ct. App. Div. 1996)).

Epocal asserts that "it is plain from the face of the 1999 Consulting Agreement that the contract ends Lauks' employment with i-STAT, and continues only specifically called out covenants in the unidentified "existing agreement," which Epocal maintains, on its face, does not include "any invention assignment provision." (Doc. 9-2 at 15.) Also, Epocal points out that the title of the Continuation Clause reads "'**Continuation of Employee Confidentiality, Non-Solicitation and Non-Competition Covenants**,'" which again does not include any invention assignment provision. (*Id.* (quoting Doc. 1, Ex. B at 4).) Finally, Epocal notes that its interpretation is consistent with other provisions of the 1999 Consulting Agreement that "specifically 'recognize[] Lauks' desire to pursue other, non-conflicting interests," and which expressly limit its scope by "stat[ing] that it 'does not extend to work on new products, whether or not based on [i-STAT's] core technology and whether or not for point-of-care blood analysis applications.'" (*Id.* at 16 (quoting Doc. 1, Ex. B at 1).)

In response, Abbott maintains that Epocal is "attempt[ing] to morph identifying language (e.g., . . . 'regarding confidentiality, non-solicitation and non-competition' in the 1999 Agreement) into restrictive language," and that "the plain meaning of the pertinent language is that the parties are identifying a specific agreement, not specific provisions in that agreement." (Doc. 15 at 10 (citations omitted).) And, as to Epocal's citation to the provisions of the 1999 Consulting Agreement that "recogniz[e] Lauks' desire to pursue other,

12

non-conflicting interests," and which state that it "does not extend to work on new products, whether or not based on [i-STAT's] core technology and whether or not for point-of-care blood analysis applications," (Doc. 1, Ex. B at 1), Abbott insists that these provisions "simply outline[] the scope of the consulting services (i.e., the areas for which Dr. Lauks is obligated to provide consulting services," but do not "provide a limitation on [Lauks's] assignment obligations," (Doc. 15 at 11).

Simply put, the court agrees with Epocal's interpretation. In part, the court finds particularly relevant that in the opening paragraph, the 1999 Consulting Agreement states that "[t]he Consulting Agreement does not extend to work on new products, whether or not based on [i-STAT's] core technology and whether or not for point-of-care blood analysis applications." (Doc. 1, Ex. B at 1.) Despite Abbott's response, the court finds that the 1999 Consulting Agreement clearly distinguishes between "consulting services" and the "Consulting Agreement." (*Id.*) Accordingly, because it is unambiguous that the 1999 Consulting Agreement "does not extend to work on new products," (*id.*), it is inconsistent to read its Continuation Clause to include the Disclosure and Assignment Covenant of the 1984 Agreement, *see Borough of Princeton*, 518 A.2d at 645. Abbott's interpretation would require the court to read nonexistent words into the 1999 Consulting Agreement, resulting in the imposition of inconsistent, unintended, and unreasonable obligations on Lauks.[5] The

---

[5] For example, Abbott's interpretation of the 1999 Consulting Agreement would require that the court read the sentence "[t]he Consulting Agreement does not extend to work on new products," as "the Consulting Agreement['s obligation on Lauks to render exclusive consulting services to i-STAT] does not extend to work on new products." (*See* Doc. 1, Ex. B at 1; Doc. 15 at 11.) And,

13

court declines to do so. *See CSFB 2001-CP-4*, 980 A.2d at 4 ("'[I]t is the function of the court to enforce [the contract] as written and not to make a better contract for either of the parties.'" (quoting *Kampf*, 161 A.2d at 717)). For these reasons, the court finds that the 1999 Consulting Agreement is unambiguous and does not continue the Disclosure and Assignment Covenant of the 1984 Agreement.

Because Abbott's claim to the Disputed Patents in the Complaint requires the continuation of the Disclosure and Assignment Covenant of the 1984 Agreement, which, as stated above, did not occur based on the unambiguous language of the 1999 Consulting Agreement, Abbott's Complaint fails to allege rights in or title to the Disputed Patents that would grant Abbott standing to sue for infringement. Epocal's Motion to Dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), (Doc. 7), is therefore due to be granted. As a result, Abbott's Motion to Compel Discovery and Determine Status of the 2000 Letter, (Doc. 23), and Epocal's Motion to Stay or Strike Abbott's Privilege Motions, (Doc. 28), are due to be denied as moot.[6]

---

Abbott's interpretation would require that the court read "Continuation of Employee Confidentiality, Non-Solicitation and Non-Competition Covenants," as "Continuation of Employee Confidentiality, Non-Solicitation[, Disclosure, Assignment] and Non-Competition Covenants." (*See* Doc. 1, Ex. B at 4; Doc. 15 at 7.) Moreover, as Epocal argued during the hearing on its Motion to Dismiss, (Doc. 7), Abbott's interpretation, on the one hand, would have allowed Lauks "to pursue other, non-conflicting interests," (*see* Doc. 1, Ex. B at 1), but, on the other hand, would have automatically granted i-STAT any rights in any inventions that Lauks "conceive[d]" of when pursuing those other interests, even if in no way applicable to any products or services of i-STAT, (*id.*, Ex. A at APOC0001006).

[6] As to Abbott's Motion for *In Camera* Review of 2000 Letter, (Doc. 25), as stated above, the court informed the parties during oral argument that this Motion would be granted, and reviewed the 2000 Letter at that time.

## IV. **CONCLUSION**

For the foregoing reasons, the court is of the opinion that Abbott's Motion for *In Camera* Review of 2000 Letter, (Doc. 25), is due to be granted, and Epocal's Motion to Dismiss, (Doc. 7), is due to be granted. Abbott's Motion to Compel Discovery and Determine Status of the 2000 Letter, (Doc. 23), and Epocal's Motion to Stay or Strike Abbott's Privilege Motions, (Doc. 28), are due to be denied as moot. An Order in conformity with this Memorandum Opinion will be entered contemporaneously.

**DONE**, this the 7th day of September, 2010.

*Sharon Lovelace Blackburn*
SHARON LOVELACE BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE